UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

PSC INDUSTRIES, INC.,                                    Plaintiff/Counter Defendant,

v.                                                       Civil Action No. 3:20-cv-146-DJH-RSE

YARBROUGH TECHNICAL
ASSOCIATES, INC.,                                        Defendant/Counter Claimant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff PSC Industries, Inc., a manufacturer based in Louisville, Kentucky, claims that its "long-time outside sales representative," Defendant Yarbrough Technical Associates, Inc. (YTA), secretly reached an agreement with one of PSC's high-level salespeople, Matthew Parr, to divert potential business away from PSC to YTA's other clients in exchange for commissions and finder's fees. (Docket No. 31, PageID.193; *see id.*, PageID.196–98) PSC alleges that YTA's arrangement with Parr breached a "Manufacturer's Representative Agreement" between PSC and YTA; that this breach discharged any further obligation of PSC to pay commissions to YTA under that contract; that YTA tortiously interfered with Parr's contractual relationship with PSC; and that YTA aided and abetted Parr's breach of his fiduciary duties. (*Id.*, PageID.199–202; *see* D.N. 1-2, PageID.9–17) YTA asserts in a counterclaim that PSC breached the parties' "Manufacturer's Representative Agreement" by failing to pay commissions to which YTA was entitled. (D.N. 32, PageID.215–18; *see* D.N. 1-2, PageID.70–72) YTA now moves for partial summary judgment on its breach-of-contract counterclaim and summary judgment on all of PSC's claims against it, and PSC cross-moves for summary judgment on its claims against YTA as well

1

as YTA's counterclaim.[1]  (D.N. 40; D.N. 41)  For the reasons explained below, YTA's motion will be granted in part and denied in part, and PSC's motion will be denied in full.

I.

The following facts come from the "cit[ations] to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), found in the parties' respective summary-judgment motions and responses.  (*See* D.N. 40; D.N. 41; D.N. 42; D.N. 43)

**A.      PSC and YTA's Agreement**

PSC is a "service-based fabricator" based in Louisville, Kentucky, that manufactures and distributes parts made out of foam, fiberglass, rubber, and other non-metallic materials for "customers in a multitude of industries."  (D.N. 41, PageID.402; *see* D.N. 41-2, PageID.438–40; D.N. 41-4, PageID.604, 621–22)  YTA is a "manufacturer's representative" based in upstate New York that generates new business for its clients and sells their manufactured products to commercial customers.  (D.N. 40, PageID.233–34; *see* D.N. 40-4, PageID.299)  YTA's principal and sole owner is William Yarbrough.  (*See* D.N. 41-8, PageID.696)

In 2001, PSC and YTA entered into a "Manufacturer's Representative Agreement" (the Agreement), under which YTA agreed to "promote the sales of and solicit orders for" PSC's "fabricated seals [and] die cut foams" in an "assigned territory" in exchange for a five-percent commission on all "net sales" that it generated for PSC.  (D.N. 40-1, PageID.258–59; D.N. 41-9, PageID.780–81)  The Agreement provided that YTA was "an independent contractor and . . . not an employee of [PSC]" and that neither party "ha[d] any authority to bind the other in any respect."

---

[1] According to YTA, its motion for summary judgment as to its breach-of-contract counterclaim is "partial" because "[i]f the Court awards summary judgment" as to PSC's liability, "YTA will file a supplemental motion concerning damages . . . with calculations relating to attorneys' fees and interest."  (D.N. 40, PageID.233 n.1)

2

(D.N. 41-9, PageID.780)  It further provided that either party could terminate the Agreement thirty days after giving written notice to the other party via registered mail.  (*Id.*, PageID.782)  Upon termination, PSC was obligated to pay commissions on YTA's pre-termination sales for up to twelve months after the date those orders had been received by PSC.  (*Id.*)

Both parties agreed that they would not, "during the term of th[e] Agreement, or for one year after termination thereof, hire or employ, or contract with in any manner, salespersons, employees or individuals that were under contract or employed . . . by each other's firm unless otherwise agreed to by both [parties] . . . in writing."  (*Id.*, PageID.781)  YTA also agreed to "hold [PSC] harmless against any and all claims, demands, damages, suits, actions, jud[gm]ents, decrees, order[s], costs and expenses (including attorney's fees) arising out of or resulting from any willful or negligent act or omission of [YTA], . . . including but not limited to third party actions or claims arising out of [YTA's] activities in connection with th[e] Agreement."[2]  (*Id.*)  PSC terminated the Agreement in August 2019 after discovering the alleged breaches by YTA described below. (D.N. 40, PageID.237; D.N. 41, PageID.413–14; *see* D.N. 40-7)

**B.**     **The 2014 GE-Rampf Referral**

PSC claims that YTA first breached the Agreement in 2014 when it allegedly worked with Matthew Parr, who was a PSC salesperson at the time, to divert a business opportunity involving General Electric (GE) away from PSC to Rampf, another YTA client and one of PSC's competitors.[3]  (*See* D.N. 41, PageID.410–11)  According to PSC, GE, which was one of Parr's

---

[2] PSC agreed to an identical indemnification provision with regard to YTA.  (*See* D.N. 41-9, PageID.781)

[3] The parties do not dispute that Parr was "employed full time in the role of [s]ales [p]erson at PSC" at the time of the 2014 GE-Rampf referral.  (D.N. 41-4, PageID.612; *see* D.N. 40, PageID.239)  In that role, according to PSC, Parr was responsible for "cultivating sales of PSC's capabilities to all potential clients"; "identify[ing] new potential clients"; and "develop[ing] close relationships with potential and existing PSC clients."  (D.N. 41-4, PageID.612)  Parr was also

sales clients, approached Parr seeking a "foam-in-place" solution for a refrigerator gasket. (D.N. 41-3, PageID.543–44; *see* D.N. 40-9, PageID.376)  The initial solution that PSC provided failed to meet GE's requirements.  (*Id.*, PageID.546)  But rather than seeing if PSC could provide another solution or at least refer GE to another manufacturer, Parr "connected" GE with YTA (D.N. 40-9, PageID.376), who then referred GE to one of its other manufacturer-clients, Rampf, thus "cutting PSC out of the supply chain . . . entirely" on a "piece of business" worth at least $400,000 by PSC's estimation.  (D.N. 41-4, PageID.602, 627)  PSC contends that Parr referred the GE opportunity to YTA in exchange for a pre-arranged commission.  (D.N. 41, PageID.410–11; *see* D.N. 41-3, PageID.546 ("Matt Parr had a relationship and an agreement with YTA[,] and he took [the GE opportunity] outside [PSC] and sourced it through Rampf."))  The record confirms that YTA later paid Parr, at a minimum, roughly $4,000 in "commissions" for the GE-Rampf referral, over a four-year period.[4]  (*See* D.N. 41-18)

YTA does not dispute that Parr referred GE to YTA after PSC's initial solution proved to be inadequate; that YTA then referred GE to Rampf, which began producing GE's requested foam-in-place gasket starting in 2016; and that YTA "ultimately paid . . . Parr a total of approximately $3,300 from 2016 through 2018" as a "'reward' for referring the GE business to YTA."  (D.N. 40, PageID.239–40; *see* D.N. 40-4, PageID.308–09, 315–20; D.N. 40-9, PageID.374, 376)  According to YTA, however, Parr referred GE to YTA because he "wanted to help his customer" and did not expect "any 'finder's fee' or commission from the referral" in return.  (D.N. 40, PageID.240; *see*

---

expected "to maintain existing clients to secure repeat business," and he had the "authority" to "negotiate rebates and givebacks on PSC's behalf in cultivating sales business."  (*Id.*)

[4] According to tax forms that PSC filed as exhibits to its summary-judgment motion, YTA paid Parr $1,064.42 in 2016, $962.54 in 2017, and $1,272.50 in 2018.  (D.N. 41-18, PageID.979–81) PSC has also produced evidence that YTA paid Parr an additional $676.46 in "commissions" in July 2019.  (*See* D.N. 41-19, PageID.984)

D.N. 40-9, PageID.376)   YTA further asserts that the "reward" Parr received was simply an unsolicited "express[ion]" of William Yarbrough's "gratitude" for Parr "having made the introduction to GE" and was "not based on any agreement" between Parr and YTA.  (D.N. 40, PageID.240, 245; *see* D.N. 40-4, PageID.309–10)  And YTA points to deposition testimony from Yarbrough and Parr suggesting that the two "understood" that YTA's reward had been approved by Parr's supervisor at PSC.[5]  (D.N. 40, PageID.240; D.N. 40-4, PageID.310–12, 317–18; D.N. 40-9, PageID.374–75)

## C.     YTA's Alleged Referral-Commission Agreement with Parr

In addition to the 2014 GE-Rampf referral, PSC claims that YTA breached the Agreement when, "[s]tarting no later than 2016," it "contracted" with Parr—who by that point was a "high-level, senior salesperson at PSC" (D.N. 41-4, PageID.612)—"to an arrangement in which YTA would pay Parr a finder's fee in exchange for any customers Parr brought to YTA."[6]  (D.N. 41, PageID.407; *see* D.N. 41-10)   Under this alleged arrangement, YTA would then refer those customers to its other manufacturer-clients, including some who competed directly with PSC.  (*See* D.N. 41, PageID.407)  In a January 2016 email exchange, Yarbrough and Parr discussed "the start of a new relationship," and Yarbrough proposed that Parr receive a ten-percent cut of any commissions that YTA earned as a result of Parr's "customer introduction[s]."[7]  (D.N. 41-10,

---

[5] The Court notes that the deposition testimony from Parr in the record here was taken in a separate case between PSC and Gary Young, Parr's former supervisor at PSC.  (*See* D.N. 40-9, PageID.373; *see* D.N. 41, PageID.408)

[6] According to PSC, Parr became a "high-level, senior salesperson" at the company "[s]tarting in 2015."  (D.N. 41-4, PageID.612)  He "became Regional Market Manager" in January of that year. (*Id.*, PageID.613)  He was then promoted to "Sales & Marketing Manager" in March 2016.  (*Id.*) And in November 2017, Parr became PSC's "Global Sales & Marketing Manager," which was the most senior position in PSC's sales department.  (*Id.*, PageID.614)

[7] In an October 2015 email to a prospective client, Yarbrough wrote, "I was referred to you *by our Mr. Matt Parr* for the possibility of bringing to you . . . a couple of the folks we represent that could potentially prove to be valuable additions to your supply chain."  (D.N. 41-11, PageID.790

PageID.787)   Yarbrough wrote that "[t]he real goal would be to build up [Parr's] YTA commissions" and added that "[t]his could really be something[,] and we could really build on [Parr's] and my contacts and customer knowledge." (*Id.*)   Yarbrough subsequently emailed Parr a "boiler plate" "Independent Contractor Agreement" describing Parr's potential role as YTA's "[s]ub-[a]gent" and a proposed commission arrangement.   (D.N. 41-12, PageID.796, 798; *see id.*, PageID.802–10)   But the record does not show that this agreement was ever signed or executed. (*See id.*, PageID.808; *see also* D.N. 40-4, PageID.321–22)

PSC offers several other pieces of evidence that it believes indicate that Parr and YTA formed some sort of "referral/commission agreement" after 2016.   (D.N. 41, PageID.416; *see id.*, PageID.407–10)   For example, in a January 2016 email to his former supervisor at PSC, Parr shared that he expected a five-percent commission from YTA on "[a]ll other business driven directly by him," which would include both "new customer[s]" and "PSC customers" that Parr would "take" to YTA.   (D.N. 41-16, PageID.826)   In a December 2017 email to Yarbrough, Parr wrote that he was "hoping to be able to review the list of customers [Yarbrough] wanted [him] to take over to ensure [Yarbrough's] 'busyness' [wa]s reduced."   (D.N. 41-15, PageID.824)   A January 23, 2018 email between Parr and Yarbrough included a spreadsheet ostensibly listing Parr's "[t]err[i]tory" and his sales "[a]ccounts" by industry.   (D.N. 41-14, PageID.818–22)   An email from January 29, 2018, stated that YTA and Parr would both "get a commission" if YTA was "awarded" a certain job from Lexmark, one of PSC's longtime customers.[8]   (D.N. 41-13,

---

(emphasis added))   PSC argues in its summary-judgment motion that this email indicates that "YTA and Parr's contractual arrangement for Parr to work for YTA while also employed by PSC pre-dated 2016."   (D.N. 41, PageID.407)

[8] PSC stated in an interrogatory response that starting in January 2015, Parr became a "key manager in charge of maintaining and expanding key PSC clients Xerox, IBM, *Lexmark*, and Electrolux."   (D.N. 41-4, PageID.613 (emphasis added))

PageID.812; *see* D.N. 41, PageID.404)    And Yarbrough wrote in a March 2018 email that he "plan[ned] to take [Parr] into" meetings with several different companies (D.N. 41-17, PageID.830).  These and other communications concerning "Parr's [alleged] work as YTA's Sub-Agent" were sent via text message and Parr's personal email account, which PSC claims is evidence of YTA's and Parr's intent to keep their alleged arrangement secret.   (D.N. 41, PageID.410; *see* D.N. 43, PageID.952; *see also, e.g.*, D.N. 41-10; D.N. 41-12; D.N. 41-23)

PSC also contends that YTA worked with Parr to facilitate a business relationship with a company called VFM, which was founded by Parr's former supervisor at PSC and is PSC's competitor.   (D.N. 41, PageID.411–13)   Following "preliminary discussions" about YTA potentially representing VFM (D.N. 41-8, PageID.725), Parr and Yarbrough executed the same non-disclosure agreement with VFM, which Parr ostensibly signed as a "[r]epresentative" of YTA (*see* D.N. 41-22, PageID.868).  Parr arranged a tour of VFM's facility in Bardstown, Kentucky, for YTA in 2018.  (*See* D.N. 41-23, PageID.874; D.N. 41-25, PageID.884)  A May 2018 text message from Yarbrough to Parr stated, "Let [VFM] make an offer, then tell [them] we will have to discuss and get back.  I won't sign with [VFM] till we tour and meet face to face."  (D.N. 41-23, PageID.875)  And in June 2018, VFM sent Parr and YTA a proposal outlining "an opportunity" for Parr that would involve working with both YTA and VFM.  (D.N. 41-8, PageID.743; *see* D.N. 41-26)

Finally, PSC points to an October 2017 email from Yarbrough to Parr as evidence that "[b]y fall 2017, YTA and Parr's discussions had turned to deepening Parr's involvement in YTA." D.N. 41, PageID.413; *see* D.N. 41-27)  In that email, Yarbrough proposed as "[f]ood for thought" that Parr join YTA full-time, earn a base salary of $100,000 plus commissions, acquire a ten-

percent ownership stake in YTA "up front," and ultimately enter a "Buy/Sell agreement" establishing a "time limit for [Parr] to acquire [YTA]." (D.N. 41-27, PageID.893)

According to YTA, all of this purported evidence of an alleged referral-commission agreement between YTA and Parr merely "relates to preliminary discussions" between Yarbrough and Parr "concerning . . . Parr's interest in possibly working for and ultimately purchasing YTA." (D.N. 40, PageID.241)   YTA asserts that these discussions "never came to fruition"; that Yarbrough and Parr "never reached an agreement for . . . Parr to purchase or become employed by YTA"; and that "PSC has produced no evidence that . . . Parr ever referred business that generated revenue for YTA after the 2014 GE[-Rampf] referral." (D.N. 40, PageID.241–42)   Yarbrough testified in a deposition that Parr never signed the January 2016 "Independent Contractor Agreement" because YTA and Parr "were not able to negotiate . . . a reasonable agreement, if you will, to move forward." (D.N. 41-8, PageID.719)   Yarbrough also stated that beyond the 2014 GE-Rampf referral, "nothing else" between YTA and Parr "ever came up or ever came to fruition." (*Id.*, PageID.709)   Yarbrough confirmed that YTA attempted to become affiliated with VFM in some way, which included "preliminary discussions" about YTA potentially representing VFM. (*Id.*, PageID.725; *see id.*, PageID.722–23)   Yarbrough further confirmed that he visited VFM's facility in Bardstown, Kentucky, in July 2018 to "see what exactly VFM did" and to "verify" whether VFM was "a competitor" with PSC.  (*Id.*, PageID.725)   But according to Yarbrough, conversations between YTA and VFM "were broken off" after YTA received a letter from PSC explaining that the latter "believed [VFM] was a competitor" and that PSC would be "bringing a lawsuit" against VFM's founder.  (*Id.*, PageID.740)

**D.     PSC's Termination of the Agreement**

In the summer of 2019, PSC "discover[ed]" the commission payments that Parr had received from YTA for the 2014 GE-Rampf referral, which prompted PSC to "investigate YTA's and Parr's communications." (D.N. 41, PageID.413; *see* D.N. 41-2, PageID.442; D.N. 41-4, PageID.598) That investigation, according to PSC, "uncover[ed]" YTA's "secret hiring of Parr as a [s]ub-agent" and YTA's "use of Parr for referrals to existing and potential PSC customers." (D.N. 41, PageID.413; *see* D.N. 41-4, PageID.598–99) PSC subsequently fired Parr in August 2019. (D.N. 41-4, PageID.614; *see* D.N. 41-2, PageID.465) And in a letter to YTA dated August 8, 2019, PSC notified YTA "of the termination of the Agreement . . . and [YTA's] association with PSC." (D.N. 40-7, PageID.369) PSC's letter explained that the "[t]ermination of the Agreement" was "effective as of August 9, 2019," and was "based on several serious concerns[,] including but not limited to conflict of interest and deceptive practices by [YTA] against PSC." (*Id.*) YTA responded with a letter stating that it "rejected" PSC's termination letter because PSC "d[id] not comply with" the "termination delivery method or . . . notice period requirements" specified in the Agreement. (D.N. 40-8, PageID.371) According to YTA, "PSC never cured the[se] defects" (D.N. 40, PageID.237), and PSC considered the Agreement terminated as of August 9, 2019 (*see* D.N. 41-2, PageID.441).

YTA asserts that in addition to unilaterally terminating the Agreement, PSC never paid YTA the commissions it earned between June 2019 and the Agreement's termination in August 2019. (D.N. 40, PageID.237; *see* D.N. 40-3, PageID.288–89) YTA further claims that it was entitled under the Agreement to receive commissions "through August 2020" on certain pre-termination sales, which PSC likewise did not pay. (D.N. 40, PageID.237; *see* D.N. 40-1, PageID.260; D.N. 40-2, PageID.277–85) According to YTA, it is owed at least $62,356.10 in

unpaid commissions.  (D.N. 40, PageID.233, 243; *see* D.N. 40-2, PageID.274–85)  PSC maintains, however, that "YTA's material breach" of the Agreement "discharged" PSC's obligation "to pay YTA any further commissions."  (D.N. 41, PageID.418; *see* D.N. 40-3, PageID.288–89)

## E.    Procedural History

PSC originally brought this matter in Jefferson Circuit Court in November 2019, alleging breach of contract and tortious interference with contractual relations.  (D.N. 1-2, PageID.9–17) PSC also sought a declaration that YTA's material breach of the Agreement "relieved" PSC "of any further obligation to perform the Agreement."  (*Id.*, PageID.15)  YTA asserted a breach-of-contract counterclaim in its answer to PSC's state-court complaint.  (D.N. 1-2, PageID.70–73)

YTA removed the case in February 2020, invoking this Court's diversity jurisdiction. (D.N. 1)  With the Court's leave, PSC filed an amended complaint in May 2021, which added a claim for aiding and abetting a breach of fiduciary duty.  (D.N. 31, PageID.201–02; *see* D.N. 30) YTA and PSC cross-moved for summary judgment in October 2021.  (D.N. 40; D.N. 41)  Both parties filed responses and replies, and the Court heard oral arguments on June 9, 2022.[9]  (D.N. 42; D.N. 43; D.N. 48; D.N. 49; *see* D.N. 54)  The parties' motions for summary judgment are now ripe for adjudication.

## II.

A court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute about such a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

---

[9] YTA also moved for leave to file a sur-reply, to which PSC offered a thorough response. (D.N. 50; D.N. 51)  The Court granted YTA's motion and noted in its Order that it would "consider all of the arguments that have been presented by the parties."  (D.N. 52, PageID.1078)

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "ultimate question" at the summary-judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party bears the initial burden of "showing the absence of a genuine issue of material fact." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Once this burden is met, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Id.*; *see* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ."). Summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). But "where reasonable minds could differ on a material fact," summary judgment "is not appropriate." *Henschel v. Clare Cty. Road Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

In deciding a summary-judgment motion, a court must "accept all of the nonmovant's evidence as true and draw all reasonable inferences in [that party's] favor." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Yet it "may not make credibility determinations nor weigh evidence when determining whether an issue of fact remains for trial." *Laster*, 746 F.3d at 726. And where, as here, a court is presented with cross-motions for summary judgment, it "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *McKay v.*

11

*Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

**III.**

The Court will start with YTA's summary-judgment motion.  (D.N. 40)  YTA moves for summary judgment on PSC's claims for breach of contract, tortious interference with contractual relations, and aiding and abetting a breach of fiduciary duty. (*Id.*, PageID.233)  YTA also moves for summary judgment in its favor on its breach-of-contract counterclaim.[10]  (*Id.*, PageID.232–33)  The Court will address each claim in turn.

**A.     Choice of Law**

As a threshold matter, the Court must determine which state's law governs each of the claims at issue in this case.  *See Hackney v. Lincoln Nat'l Fire Ins. Co.*, 657 F. App'x 563, 570 (6th Cir. 2016).  "A federal court sitting in diversity must apply the choice-of-law rules of the forum state." *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 389 (6th Cir. 2017) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  In Kentucky, "different choice of law rules apply to tort actions versus contract disputes."  *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  The Court will thus address the contract and non-contract claims separately.

---

[10] YTA likewise moves for summary judgment on a fourth "[c]laim for [r]elief" that PSC asserts in its amended complaint, in which PSC seeks a "declaration of rights" as to "whether YTA is entitled to any further commissions despite its material breaches of the Agreement."  (D.N. 31, PageID.200; *see* D.N. 40, PageID.233)  This declaration-of-rights claim, however, rises and falls with YTA's breach-of-contract counterclaim.  (*See* D.N. 32, PageID.215–18)  Deciding whether PSC breached the Agreement by failing to pay certain commissions that YTA earned (*see id.*) will necessarily resolve "the parties' respective rights and obligations under the Agreement" as to those unpaid commissions.  (D.N. 31, PageID.200)  Accordingly, the Court need not address the merits of PSC's declaration-of-rights claim separately from YTA's counterclaim.

1.      **The Parties' Breach-of-Contract Claims**

Starting with PSC's breach-of-contract claim and YTA's breach-of-contract counterclaim, the Agreement at issue here expressly provides that it "shall be governed by the laws of the State of New York, all rights and remedies being governed by said laws."  (D.N. 41-9, PageID.782) Accordingly, PSC and YTA both assert in their summary-judgment motions that New York law applies to their respective breach-of-contract claims.  (*See* D.N. 40, PageID.244; D.N. 41, PageID.415)

As the Sixth Circuit "ha[s] noted on numerous occasions," however, "Kentucky courts have an extremely strong and highly unusual preference for applying Kentucky law even in situations where most states would decline to apply their own laws."  *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017) (collecting cases).  One consequence of this "unusual preference" is that "[i]n the contractual context," Kentucky courts "will not automatically honor a choice-of-law provision, to the exclusion of all other considerations."  *Id.* (quoting *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 393 (6th Cir. 2000)); *see Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 791 (W.D. Ky. 2005) (observing that a choice-of-law provision in a contract "is not necessarily determinative of the [choice-of-law] issue" under Kentucky law).  Rather, Kentucky courts "appl[y] § 188 of the Restatement (Second) of Conflict of Laws to resolve choice of law issues that arise in contract disputes," *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013), even where a contract contains a choice-of-law provision.  *See Hackney*, 657 F. App'x at 570; *see also Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 709 (W.D. Ky. 2013) (acknowledging that Kentucky courts apply the Restatement (Second) "even where the parties have expressly agreed to have their contractual rights and duties governed by a particular state's laws").  Under § 188 of the Restatement, an "issue in contract" is governed

13

by the law of the state with "the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188(1) (Am. Law Inst. 1971). And crucially, "Kentucky's most-substantial-relationship test trumps even an otherwise-valid choice of law clause when the dispute is centered in Kentucky." *Osborn*, 865 F.3d at 444; *see Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 566–67 (Ky. 2012) (applying Kentucky law despite the contract in question having a New York choice-of-law provision because Kentucky had "the greater interest and the most significant relationship to the transaction and the parties"); *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982) (applying Kentucky law despite the insurance contract in question having a Delaware choice-of-law provision).

Because the Court is obligated to apply Kentucky's choice-of-law rules, *see Stone Surgical*, 858 F.3d at 389, it must therefore determine under the Restatement's most-significant-relationship test whether New York or Kentucky law governs the parties' breach-of-contract claims here. *See Hackney*, 657 F. App'x at 570–71. Under that test, the "principles" that dictate which state has the "most significant relationship" to a contract dispute include

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) § 6(2); *see id.* § 188 cmt. b. And "in applying the[se] principles," a court should consider the following state "contacts": "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties." *Id.* § 188(2); *see Hackney*, 657 F. App'x at 571. The most-significant-relationship test requires "balanc[ing] principles, policies, factors, weights, and emphases to reach

a result," and the Sixth Circuit has acknowledged that such a multifaceted analysis often "does not proceed with mathematical precision." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 606 (6th Cir. 1996); *see id.* (noting that the "choice of law principles found in the Restatement" are "relatively elastic, and in some cases equivocal").

Applying the most-significant-relationship test here, the Court concludes that New York law governs the parties' breach-of-contract claims for several reasons.   First, New York's "contacts" with both the Agreement and the parties in this matter are substantial.  *See* Restatement (Second) § 188(2).  YTA is a New York corporation and has its principal place of business in the state (*see* D.N. 31, PageID.193–94; D.N. 32, PageID.212).  *See* Restatement (Second) § 188(2)(e). Moreover, New York was a key "place of performance" under the Agreement, *see id.* § 188(2)(c): YTA agreed to "promote the sales of and solicit orders for" PSC's "products and services" in a territory that included upstate New York, and PSC sent commission payments to New York-based YTA in return (*see* D.N. 41-9, PageID.780–81, 784).  *See* Restatement (Second) § 188 cmt. e ("When both parties are to perform in [a] state, th[at] state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance.").

Second, Kentucky's contacts with "the transaction and the parties" here are not more "significant" than New York's.  *Id.* § 188(1).  PSC is headquartered in Kentucky (*see* D.N. 31, PageID.193), but this contact is no more significant than YTA's presence in New York.  *See id.* § 188(2)(e) (instructing courts to consider the "place of business *of the parties*" (emphasis added)). The Court notes that the Agreement concerned products manufactured by a Kentucky-based company.  *Id.* § 188(2)(d).  But PSC has twenty-two facilities located around the globe (D.N. 41-2, PageID.437), and it is unclear from the current record how many of the "fabricated seals and

15

die cut foams" governed by the Agreement (D.N. 41-9, PageID.780) were actually produced in Kentucky. *See Black v. Dixie Consumer Prods. LLC*, No. 1:08-cv-142-JHM, 2018 WL 1144592, at *4 (W.D. Ky. Mar. 2, 2018) (concluding that Kentucky law did not apply to a contract dispute in part because the contract at issue "did not limit performance to shipping services in Kentucky, but was national in scope"). Furthermore, PSC's primary obligation under the Agreement had little to do with Kentucky: the company sent commission payments to a New York-based sales representative for sales made outside of Kentucky to commercial customers based in other states. (*See id.*, PageID.781, 784 (describing YTA's "territory")) In short, this matter is far from the sort of "dispute . . . centered in Kentucky" that typically "trumps . . . an otherwise-valid choice of law clause." *Osborn*, 865 F.3d at 444; *see id.* (applying Kentucky law to a trust despite an Ohio choice-of-law provision because there was "*no question* that Kentucky ha[d] the most significant relationship" to the trust (emphasis added)); *Schnuerle*, 376 S.W.3d at 567 (applying Kentucky law in a contract dispute despite a New York choice-of-law provision because "*there [was] no doubt*" that Kentucky had the most significant relationship to the "transaction and the parties" (emphasis added)); *Breeding*, 633 S.W.2d at 719 (applying Kentucky law despite a Delaware choice-of-law provision because it was "*patently obvious*" that Kentucky had the most significant relationship to a contract dispute involving insurance "purchased in Kentucky by a Kentucky resident from a Kentucky corporation" (emphasis added)); *see also Novolex Holdings, LLC v. Wurzburger*, No. 19-cv-145-DLB-CJS, 2020 WL 4758360, at *5 (E.D. Ky. Aug. 17, 2020) (concluding that a Delaware choice-of-law provision "should be enforced" rather than Kentucky law in part because "there [wa]s no suggestion" that the contract dispute at issue was "centered predominantly in Kentucky").

Finally, other choice-of-law principles that a court must consider under the most-significant-relationship test weigh in favor of applying New York law here. *See id.* § 6(2). Although the Agreement's choice-of-law provision is "not necessarily determinative of the [choice-of-law] issue," *Davis*, 399 F. Supp. 2d at 791, it is not wholly irrelevant either. *See, e.g.*, *Black*, 2018 WL 1144592, at *5 (considering a choice-of-law provision as part of a most-significant-relationship analysis); *see also Novolex*, 2020 WL 4758360, at *5. Applying the same state law called for by that provision would "protect[]" PSC's and YTA's "justified expectations," as manifested by the terms of the Agreement. Restatement (Second) § 6(2)(d); *see id.* § 188 cmt. b ("[T]he protection of the justified expectations of the parties is of considerable importance in contracts . . . ."); *see also Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971, 984 (E.D. Ky. 2016) (noting that applying the same state law called for by a choice-of-law provision "protect[ed] justified expectations and promote[d] uniformity"). And applying the state law agreed to by the parties to a sales-representative contract covering multiple states—and thus, by extension, multiple jurisdictions with varying contract rules—facilitates "certainty, predictability, and uniformity of result." Restatement (Second) § 6(2)(f); *cf. Certain Underwriters at Lloyd's, London v. Morrow*, No. 1:16-cv-180-GNS-HBB, 2019 WL 3558177, at *4 (W.D. Ky. Aug. 5, 2019) (concluding that "considerations of certainty and uniformity of result strongly favor[ed] applying Georgia law" over Kentucky law "[d]espite Kentucky's general tendency to be 'very egocentric or protective concerning choice of law questions'").

In sum, because of Kentucky's preference for applying its own law, the choice-of-law provision in the Agreement is not dispositive of which state's law governs the parties' breach-of-contract claims here. *Osborn*, 865 F.3d at 443. But for the reasons explained above, the Court concludes that under the applicable most-significant-relationship test, *see State Farm*, 413 S.W.3d

at 878, those claims are governed by New York law.  *See* Restatement (Second) § 188(1) (providing that the law of the state with the "most significant relationship to the transaction and the parties" should govern "an issue in contract"); *see also Acuity Brands, Inc.*, 172 F. Supp. 3d at 983 ("Even Kentucky law, with its egocentric twist on choice of law rules, acknowledges that there are situations in which its laws should not be applied.").

### 2.      PSC's Other Claims

The choice-of-law analysis for PSC's tortious-interference and aiding-and-abetting claims (*see* D.N. 31, PageID.200–02) is much more straightforward.  Both claims sound in tort.  *See Sparkman v. Consol Energy, Inc.*, 571 S.W.3d 569, 571 (Ky. 2019); *Insight Ky. Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016).  And for tort claims, "Kentucky courts hold that '*any* significant contact with Kentucky is sufficient to allow an application of Kentucky law.'"  *Memorial Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 358 (W.D. Ky. 2020) (emphasis in original) (quoting *Reichwein v. Jackson Purchase Energy Corp.*, 397 S.W.3d 413, 416 (Ky. Ct. App. 2012)).  Put another way, "if there are significant contacts—not necessarily the most significant contacts—with Kentucky," then Kentucky law should apply.  *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972) (holding that Kentucky law applied to a case involving the death of a Kentucky resident in a car accident despite the fact that the tortfeasor was domiciled in Ohio and the fatal accident occurred in Ohio).

Here, PSC is headquartered in Kentucky; PSC's claims concern alleged agreements between YTA and Matthew Parr, a PSC salesperson based in Kentucky; and "at least some of the allegedly tortious conduct" here "took place" in Kentucky, *Hackney*, 657 F. App'x at 571.  (*See* D.N. 41, PageID.402, 407–13)  Given these "significant contacts" with the state, *Foster*, 484 S.W.2d at 829, the Court thus concludes, and the parties agree, that Kentucky law governs PSC's

tortious-interference and aiding-and-abetting claims.  (*See* D.N. 40, PageID.251, 253; D.N. 41, PageID.420 n.6)

**B.    PSC's Breach-of-Contract Claim**

Moving to the merits, the Court will first decide whether YTA is entitled to summary judgment on PSC's breach-of-contract claim.  (*See* D.N. 40, PageID.244–50)  To prevail on that claim under New York law, PSC must prove "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach."  *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*, 156 F. App'x 349, 350–51 (2d Cir. 2005)); *see Riccio v. Genworth Fin.*, 124 N.Y.S.3d 370, 372 (N.Y. App. Div. 2020).

The crux of PSC's breach-of-contract claim is that YTA "reached an agreement with Parr," a former high-level salesperson with PSC, in which Parr worked "as a [s]ub-[a]gent for YTA to refer manufacturing and other business to non-PSC companies through YTA, in exchange for . . . sales-based commissions."  (D.N. 41, PageID.416; *see* D.N. 31, PageID.199; D.N. 43, PageID.941–43)  According to PSC, this alleged arrangement breached the provision in the Agreement that barred PSC and YTA from "contract[ing] with in any manner[] salespersons, employees, or individuals . . . under contract or employed [by] . . . each other's firm unless otherwise agreed to" by both parties "in writing."  (D.N. 41-9, PageID.781; *see* D.N. 41, PageID.417)  PSC contends, in other words, that the 2014 GE-Rampf referral and Parr's alleged referral-commission agreement with YTA "breached" YTA's "contractual obligation" to not "contract with" PSC employees like Parr "in any manner."  (D.N. 41, PageID.417; *see* D.N. 41-9, PageID.781)

In its summary-judgment motion, YTA does not dispute the Agreement's existence or validity.  (*See* D.N. 40, PageID.245)  Nor does it challenge PSC's interpretation of the provision prohibiting the parties from "contract[ing] with" each other's employees "in any manner."  (*See* D.N. 41-9, PageID.781)  YTA instead contends that it is entitled to summary judgment on PSC's breach-of-contract claim (1) because PSC has failed to show that "YTA entered into any oral or written 'contract with'" Parr and thus cannot establish any breach of the Agreement, and (2) because "PSC has failed to produce evidence of any actual damages caused by YTA's alleged breach[es]."  (D.N. 40, PageID.238, 248; *see id.*, PageID.239–42)

Starting with the former argument, the parties agree that the question of whether YTA breached the Agreement hinges on whether it formed some sort of contract with Parr.  PSC argues, for instance, that the 2014 GE-Rampf referral was made pursuant to a "commission-kickback agreement" between YTA and Parr (D.N. 43, PageID.943); that YTA and Parr later "memorialized" a "[s]ub-[a]gent" agreement under which Parr "would route potential PSC business through YTA" in exchange for "commission[] kickbacks" (D.N. 41, PageID.407, 409); and that as part of that "[s]ub-[a]gent" agreement, YTA "used Parr as an agent for purposes of YTA's efforts to secure a business relationship with PSC's competitor VFM."  (*Id.*, PageID.416) YTA, on the other hand, contends that the 2014 GE-Rampf referral "was not a 'contract'"; that the commissions Parr received for that referral "were a mere gratuity" and "not based on any agreement" between YTA and Parr; that subsequent communications between YTA and Parr about a commission arrangement were "preliminary discussions" that "never came to fruition"; and that Parr "never entered into any agreement to be employed by" or serve as an agent for YTA. (D.N. 40, PageID.239, 241, 245)

"To create a binding contract" in New York, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)).  Put another way, there must be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Express Indus.*, 715 N.E.2d at 1053.  A "mere agreement to agree, in which a material term is left for future negotiations," is not sufficient. *Tractebel*, 487 F.3d at 95 (quoting *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981)).  A "preliminary agreement," moreover, ordinarily does not create a binding contract "where the parties contemplate further negotiations and the execution of a formal instrument." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 355 (S.D.N.Y. 2012) (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 123–24 (2d Cir. 2008)).  But "not all terms of a contract need be fixed with absolute certainty" in order for the contract to be enforceable. *Tractebel*, 487 F.3d at 95 (quoting *Express Indus.*, 715 N.E.2d at 1053)).

YTA is right that PSC has not produced evidence of a formal written contract between YTA and Parr.  (*See* D.N. 40, PageID.238; D.N. 48, PageID.990)  The January 2016 email in which Parr and Yarbrough discuss the "start of a new relationship," for example, contains language indicating that the two were still negotiating Parr's precise role with YTA and a proposed commission structure (*see* D.N. 41-10).  *See Nat'l Gear & Piston, Inc.*, 861 F. Supp. 2d at 356 (noting that "preliminary agreement[s]" generally are not binding contracts).  And PSC's assertion that YTA and Parr "memorialized" their arrangement in a "written 'Independent Contractor Agreement'/'Sub-Agent Agreement'" (D.N. 41, PageID.407) is undermined by the fact that nothing in the record shows that YTA and Parr ever finalized the terms of that written contract.

21

(*See* D.N. 41-12, PageID.808; *id.*, PageID.796 ("Take a look at the boiler plate and if OK, we can add the territory (accounts), principals involved[,] and a commission schedule."); *see also* D.N. 40-4, PageID.321–22)

Two points are worth underscoring, however. First, under New York law, "[c]ontracts can be written, oral, or implied in fact." *Can't Stop Prods., Inc. v. Sixuvus, Ltd.*, 295 F. Supp. 3d 381, 400 (S.D.N.Y. 2018). Accordingly, "absent a written agreement" between YTA and Parr, a contract between them may nonetheless "be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 455 (S.D.N.Y. 2014); *see Amcat Glob., Inc. v. Greater Binghampton Dev., LLC*, 33 N.Y.S.3d 555, 558 (N.Y. App. Div. 2016) ("It has long been established that '[a] meeting of the minds may be inferred from [the parties'] acts as well as words." (alterations in original)). In other words, whether YTA and Parr reached a "binding agreement" can potentially be inferred from their conduct. *Beth Israel Med. Ctr. V. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006); *see Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975) (noting that a "contract implied in fact" is "just as binding as an express contract" because "in the law there is no distinction between agreements made by words and those made by conduct"). And whether such an implied contract was formed "involves factual issues regarding the parties' intent and the surrounding circumstances," which typically must be resolved by the trier of fact. *Airday v. City of New York*, 310 F. Supp. 3d 399, 421 (S.D.N.Y. 2018); *see Deutsche Asset Mgmt., Inc. v. Callaghan*, No. 01-cv-4426-CBM, 2004 WL 758303, at *16 (S.D.N.Y. Apr. 7, 2004) ("Whether or not contract formation can be implied from the parties' course of conduct is [a] question for the trier of fact."); *see also Amcat Glob.*, 33

N.Y.S.3d at 558 ("Whether an implied-in-fact contract exists will often depend on the credibility of the witnesses and its assessment by the trier of fact.").

Second, PSC need not definitively prove at the summary-judgment stage that YTA and Parr formed a "referral/commission agreement" of some sort.  (D.N. 41, PageID.416)  Rather, as the non-movant, PSC must only produce enough evidence such that "reasonable minds could differ" on the material factual question of whether such an agreement was ever reached.  *Henschel*, 737 F.3d at 1022.  PSC can therefore survive summary judgment on its breach-of-contract claim if the evidence it has produced shows a genuine factual dispute as to whether YTA's and Parr's conduct during and after the 2014 GE-Rampf referral indicated that they were acting pursuant to an implied contract between them.  *See Beth Israel*, 448 F.3d at 582 ("[T]he conduct of the parties may lead to the inference of a binding agreement . . . ."); *see also Airday*, 310 F. Supp. 3d at 421 (denying summary judgment on a procedural-due-process claim concerning an alleged property right because the plaintiff had "demonstrated that a factual issue exist[ed] as to whether an implied contract was created").

PSC has met that burden here.  Consider the 2014 GE-Rampf referral.  YTA does not dispute that GE first approached PSC to find a suitable "foam-in-place" solution; that Parr eventually referred GE to YTA; and that YTA connected GE with one of PSC's competitors, Rampf.  (D.N. 40, PageID.239–40; *see* D.N. 40-4, PageID.308–10; D.N. 40-9, PageID.376)  YTA likewise does not dispute that it "reward[ed]" Parr for this referral (D.N. 40, PageID.240), and the record shows that this reward came in the form of monthly "commission" payments made between 2016 and 2019.  (*See* D.N. 41-18; D.N. 41-19)  Deposition testimony from PSC's corporate representatives indicates that Parr's referral of GE to YTA did not comport with PSC's standard business practices: Rather than trying to find a PSC-manufactured solution for GE, or at least

23

keeping PSC within the supply chain, Parr "cut PSC out of the deal" entirely.   (D.N. 41, PageID.418; *see* D.N. 41-2, PageID.446–47 (suggesting that PSC could have earned a commission for finding a solution for GE); D.N. 41-3, PageID.546)  PSC underscored at oral argument that YTA never contacted PSC to confirm whether the latter approved of the GE referral or YTA's subsequent commission payments to Parr.  The record further suggests that YTA recognized that the GE referral created "a conflict" for Parr.  (D.N. 41-10, PageID.787)  And Yarbrough testified during his deposition that he did not consider the GE-Rampf referral to be a "one-off" and instead thought that YTA's relationship with Parr could potentially "blossom" into other opportunities.  (D.N. 41-8, PageID.709)  Construing this evidence and the inferences drawn from it in PSC's favor, *see Loyd* 766 F.3d at 588, a reasonable jury could infer from the conduct just described that the 2014 GE-Rampf referral was made in accordance with some sort of implied referral-for-commission agreement between YTA and Parr.  *See Beth Israel*, 448 F.3d at 582; *see also Henschel*, 737 F.3d at 1022 (noting that summary judgment is "inappropriate" where "reasonable minds could differ on a material fact").

YTA contends that the two-year gap between the 2014 GE-Rampf referral and Parr's receipt of his first commission payment in 2016 confirms that the commissions were "not based on any agreement" that Parr and YTA "had reached *before* . . . Parr introduced YTA to GE." (D.N. 40, PageID.245 (emphasis in original); *see* D.N. 42, PageID.902–03)  But as PSC notes in response, the GE-Rampf job did not go into production until early 2016, and Parr likely could not have received "kickback payments" for his referral "until YTA itself received . . . commissions" from Rampf.  (D.N. 43, PageID.947; *see* D.N. 41-8, PageID.708)  YTA also characterizes its commission payments to Parr as "a voluntary gratuity provided after performance," which, as a matter of law, could not have constituted the "consideration necessary to support a contract."

24

(D.N. 40, PageID.245)   But the legal question of whether the commissions may properly be considered a "mere gratuity" (*id.*) depends on the antecedent factual question of whether Parr referred GE to YTA with the expectation that he would receive a commission in return.   (*Compare id.*, PageID.240 (asserting that Parr "had no financial incentive to make an introduction between YTA and the GE representative"), *and* D.N. 40-9, PageID.376 (asserting the same), *with* D.N. 41, PageID.411 (asserting that "Parr routed the [GE] referral through YTA so that he could secure his finder's fee"), *and* D.N. 41-10, PageID.787 (mentioning "GE Rampf jobs" while describing a potential commission arrangement between Parr and YTA))   And that factual question in turn depends in large part on Yarbrough's and Parr's credibility, which cannot be assessed at the summary-judgment stage. *Laster*, 746 F.3d at 726.

PSC has also established a genuine factual dispute as to whether YTA and Parr acted pursuant to some sort of "referral/commission agreement" in the years after the 2014 GE-Rampf referral.   (D.N. 41, PageID.417)   In a January 2016 email exchange, for instance, Yarbrough and Parr discussed in detail a potential commission structure and the possibility that Parr could earn commissions from "GE or other accounts."   (D.N. 41-10, PageID.787)   Yarbrough had already stated in an October 2015 email that he had been "referred" to a manufacturer by "our Mr. Matt Parr."   (D.N. 41-11, PageID.790)   Additional email exchanges from 2018 suggest that both YTA and Parr planned to receive commissions from a specific project involving Lexmark (*see* D.N. 41-13); that Parr was assigned sales accounts and a sales territory by YTA (D.N. 41-14); and that Yarbrough "plan[ned] to take [Parr] into" meetings with several manufacturers.   (D.N. 41-17, PageID.830)   YTA also does not dispute that it worked with Parr to potentially secure business with PSC's competitor, VFM, which included arranging a visit to VFM's facilities in 2018.   (*See* D.N. 40, PageID.241–42; D.N. 40-4, PageID.329)   While this evidence does not prove that YTA

and Parr formed a contract to work together, a reasonable jury could nonetheless infer from their conduct and communications that the two parties intended for Parr to refer business to YTA in exchange for commissions. *See Beth Israel*, 448 F.3d at 582 ("A contract implied in fact . . . is derived from the presumed intention of the parties as indicated by their conduct.").

Even if PSC has established a genuine factual dispute as to breach, however, YTA argues that summary judgment is still warranted on PSC's breach-of-contract claim because PSC "has failed to produce evidence of any actual damages caused by YTA's alleged breach[es]." (D.N. 40, PageID.248) In addition to proving breach, a plaintiff bringing a breach-of-contract claim in New York "must still prove damages." *Moreno-Godoy*, 7 F.4th at 85; *see Magee-Boyle v. Reliastar Life Ins. Co. of N.Y.*, 105 N.Y.S.3d 90, 92 (N.Y. App. Div. 2019) (describing "damages resulting from [a] breach" as an "essential element[]" of a breach-of-contract claim in New York). The plaintiff "must demonstrate" that any claimed damages "were caused by" the defendant's breach. *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 731 (2d Cir. 1992). Those damages must also be "*reasonably certain*" rather than "merely speculative, possible, and imaginary." *Tractebel*, 487 F.3d at 110 (emphasis in original) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (N.Y. 1886)). Yet "'[c]ertainty,' as it pertains to general damages, refers to the *fact* of damage, not the amount." *Id.* (emphasis in original).

Here, assuming that YTA's alleged arrangements with Parr breached the Agreement, PSC has sufficiently established for purposes of surviving summary judgment that it suffered some measure of damages as a result of that breach. *See id.* For one, it is "well established" in New York that a "non-breaching party may recover 'general damages which are the natural and probable consequence of [a] breach.'" *Moreno-Godoy*, 7 F.4th at 85 (quoting *Kenford Co. v. Cty. of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989)). And PSC has offered evidence indicating it would have earned

some amount in commissions on a roughly "$400,000 piece of business" had Parr not referred GE to YTA in 2014.[11]  (D.N. 41, PageID.411; D.N. 41-4, PageID.627–28; *see* D.N. 41-2, PageID.447 ("[PSC] would just get that commission instead of YTA.  I don't know why YTA [was] involved in it."))  Furthermore, if PSC prevails on its breach-of-contract claim, it could likely recover "attorneys' fees and costs associated with YTA's [alleged] wrongful conduct" under the Agreement's indemnification provision (D.N. 41, PageID.419), which provides in relevant part that YTA will "hold [PSC] harmless against *any and all* claims, . . . suits, actions, . . . *costs and expenses* (*including attorney's fees*) arising out of or resulting from any willful or negligent act or omission of [YTA]" (D.N. 41-9, PageID.781 (emphasis added)).  *See Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (noting that parties to a contract "may agree that attorneys' fees should be included as another form of damages" for a breach of that contract).  And even if PSC could not "prove any damages stemming from" YTA's alleged breaches, under New York law, PSC could "still maintain its claim for breach of contract" here and "recover nominal damages."  *Medinol Ltd. v. Boston Sci. Corp.*, 346 F. Supp. 2d 575, 599 (S.D.N.Y. 2004); *see*

---

[11] PSC argues that if it were to prevail on its breach-of-contract claim, it would be entitled to claw back the $216,776.96 in commissions it paid to YTA between January 2016—the "conservative starting point" of YTA's alleged breaches—and August 2019, when PSC terminated the Agreement. (D.N. 41, PageID.418; *see* D.N. 43, PageID.951)  Yet PSC cites no authority for such a remedy.  (*See* D.N. 41, PageID.418)  As a general matter, courts applying New York law have observed that "[d]isgorgement of profits is not an appropriate remedy for a breach of contract" because disgorgement "looks to the defendant's ill-gotten gains, rather than to the plaintiff's losses."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005); *see Franconero v. Universal Music Corp.*, No. 02-cv-1963-BSJ, 2011 WL 566794, at *4 (S.D.N.Y. Feb. 11, 2011).  Additionally, "damages for breach of contract should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002).  But if PSC were permitted to claw back YTA's commissions, it would find itself in the enviable position of having acquired new customers and earned substantial revenue from YTA's sales efforts without having incurred any attendant costs for such benefits.  Accordingly, any commissions that PSC has already paid to YTA are not recoverable under the breach-of-contract theory asserted here.  *See Topps Co.*, 380 F. Supp. 2d at 269.

*Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993) ("Nominal damages are always available in breach of contract actions . . . ."); *Perry v. McMahan*, 84 N.Y.S.3d 508, 510 (N.Y. App. Div. 2018) ("In breach of contract actions, actual damages are not an essential element, and nominal damages are recoverable to vindicate contract rights."); *see also Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*, No. 09-cv-1796-GBD, 2012 WL 3890128, at *11 (S.D.N.Y. Sept. 7, 2012) (stating that the plaintiff's "failure to prove compensatory damages [did] not . . . entitle [the defendant] to summary judgment" on a breach-of-contract claim because the plaintiff could recover nominal damages under New York law).

In sum, PSC has shown that there are genuine factual disputes as to whether YTA "contract[ed] with" Parr (D.N. 41-9, PageID.781)—and thus breached the Agreement—by agreeing to pay him commissions in exchange for the 2014 GE-Rampf referral and by subsequently entering into an implied "referral/commission agreement" of some sort.  (D.N. 41, PageID.415–17)  Those factual disputes cannot be resolved at the summary-judgment stage.  *See Henschel*, 737 F.3d at 1022.  YTA's motion for summary judgment as to PSC's breach-of-contract claim will therefore be denied.  *See* Fed. R. Civ. P. 56(a).

## C.     YTA's Breach-of-Contract Counterclaim

The Court will next decide whether summary judgment is warranted on YTA's breach-of-contract counterclaim, the merits of which overlap with PSC's breach-of-contract claim.  (*See* D.N. 40, PageID.244–48; D.N. 41, PageID.419)  YTA asserts that PSC's failure to pay at least $62,356.10 in commissions that YTA earned under the Agreement amounts to a breach of contract.[12]  (D.N. 40, PageID.232, 245)  YTA has offered evidence indicating that PSC stopped

_____

[12] Under the Agreement, PSC was obligated to pay a five-percent commission on all "net sales" that YTA secured on its behalf, and in the event the Agreement was terminated, PSC was obligated to pay commissions on any pre-termination sales for up to twelve months after the Agreement's

paying commissions in June 2019, which PSC does not dispute.  (D.N. 40, PageID.237; *see* D.N. 40-3, PageID.288–90)  According to PSC, however, YTA breached the Agreement first by forming a "referral/commission agreement" with Parr "years before" PSC's alleged breach. (D.N. 41, PageID.416, 419)   And PSC maintains that upon discovering YTA's "preexisting material breach" in the summer of 2019, it was "discharged" of its "contractual obligation to pay YTA any further commissions under the breached Agreement."  (*Id.*, PageID.414, 418)

In New York, a contract breach "excuse[s] the nonbreaching party from further performance" only if the breach is "material." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006); *see USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 185 (S.D.N.Y. 2011) ("Unless a breach is material, the obligations of a counterparty to a contract remain effective.").  To be "material," a breach "must go to the root of the agreement between the parties." *Bear Stearns Funding, Inc. v. Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).  That is, "the other party's breach of the contract" must be "so substantial that it defeats the object of the parties in making the contract." *Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013) (quoting *Frank Felix*, 111 F.3d at 289).

Since YTA will bear the burden of proof at trial on its breach-of-contract counterclaim, it can prevail on that claim at the summary-judgment stage only if there is no genuine factual dispute

---

termination date.  (D.N. 41-9, PageID.781–82)  According to YTA, "PSC's own records show that YTA generated revenue of approximately $1,247,122 for PSC" between June 2019, when PSC stopped paying commissions to YTA, and August 2020, which marked "the end of YTA's contractual right to continue to receive commission payments."  (D.N. 40, PageID.243; *see* D.N. 40-2)  A five-percent commission on that revenue figure—i.e., 0.05($1,247,122)—would amount to $62,356.10.  The Court also notes that YTA alleges as part of its counterclaim that it is "entitled to recover two times" this unpaid-commission amount under New York's labor laws. (D.N. 32, PageID.217; *see* D.N. 40, PageID.233 n.1)

(1) that YTA did not breach the Agreement or (2) if it did, that its breach "d[id] not rise to the appropriate level of materiality to justify" PSC's non-performance of its commission obligations. *Bear Stearns Funding, Inc.*, 361 F. Supp. 2d at 291.  YTA cannot prevail on the first basis because, as explained in detail above, there are several genuine factual disputes as to whether it breached the Agreement by "contract[ing] with" Parr.  (D.N. 41-9, PageID.781)

Nor can YTA prevail on the basis that none of its alleged breaches were material.  Courts in New York have made clear that "in most cases, the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment."  *Bear Stearns Funding, Inc.*, 361 F. Supp. 2d at 295; *see Teachers Ins. & Annuity Ass'n of Am. v. Coaxial Commc'ns of Cent. Ohio, Inc.*, 807 F. Supp. 1155, 1160 (S.D.N.Y. 1992) ("[I]t is for the jury to determine materiality with respect to any alleged breach."); *see also Mega Grp. Inc. v. Halton*, 736 N.Y.S.2d 444, 446 (N.Y. App. Div. 2002) ("Whether promises in a contract are mutually dependent upon each other such that a failure to act by one party excuses nonperformance by the other ordinarily is a question of fact.").  And here, genuine factual disputes about whether YTA breached the Agreement, the degree to which it allegedly did so, and the extent to which that alleged conduct went "to the root of" the Agreement preclude the Court from resolving the materiality question on summary judgment.  *Bear Stearns Funding, Inc.*, 361 F. Supp. 2d at 295 (quoting *Frank Felix*, 111 F.3d at 289); *see id.* at 296–97 (denying summary judgment on a breach-of-contract claim because the "issues relevant" to the materiality of an alleged breach were "intensely factual" and "not appropriate for summary disposition"); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (noting that the issue of whether a party has committed a material breach "should be decided as a matter of law only where the inferences are certain").

In short, the Court cannot conclude as a matter of law here that YTA did not materially breach the Agreement.[13]  And because a material breach by YTA would have excused PSC of its obligation under the Agreement to pay additional commissions, *see New Windsor Volunteer Ambulance Corps, Inc.*, 442 F.3d at 117, YTA has not established that PSC's failure to pay those commissions amounted to a breach of contract.  YTA's motion for summary judgment on its breach-of-contract counterclaim will accordingly be denied.[14]

## D.    PSC's Tortious-Interference Claim

In addition to the breach-of-contract claims, YTA moves for summary judgment on PSC's claim of tortious interference with contractual relations.  (D.N. 40, PageID.250–53; *see* D.N. 31, PageID.200–01)  Under Kentucky law, a plaintiff bringing a tortious-interference claim must show

---

[13] YTA argues in its summary-judgment motion that PSC's failure to pay commissions after June 2019 was not excused because "YTA substantially performed its obligations under the Agreement through the termination date."  (D.N. 40, PageID.248)  Under New York law, however, determining whether a breaching party substantially performed its obligations under a contract is just another way of determining whether that party's breach was material.  *See Merrill Lynch & Co.*, 500 F.3d at 186 ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, *synonymously*, where that party has committed a material breach." (emphasis added)); *Barbagallo*, 925 F. Supp. 2d at 287 ("Conversely, a breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the contract.").  Here, the fact that YTA "promoted and solicited orders under the Agreement for nearly eighteen years, resulting [in] millions of dollars of sales of PSC's products and services" (D.N. 40, PageID.247) certainly "represent[s] advanced performance of the contract in a chronological sense."  *Merrill Lynch*, 500 F.3d at 187.  But if PSC establishes at trial that YTA formed some sort of referral-commission agreement with Parr to divert customers and business away from PSC, the Agreement's longevity would not preclude the conclusion that such conduct on YTA's part "defeat[ed] the object of the parties in making the [Agreement]" and thus constituted a material breach.  *Id.* (quoting *Frank Felix*, 111 F.3d at 289); *see id.* ("It follows that if [one party to a contract] breached one or more warranties and the cumulative effect of such breaches was material, it did not substantially perform its side of the deal.").

[14] In concluding that summary judgment on YTA's breach-of-contract counterclaim is not warranted because there are genuine factual disputes as to whether an earlier breach by YTA relieved PSC of its obligation to pay commissions under the Agreement, the Court necessarily concludes that summary judgment is likewise not warranted on PSC's declaration-of-rights claim, which concerns the same unpaid commissions.  (*See* D.N. 31, PageID.200; D.N. 40, PageID.233)

(1) "the existence of a contract"; (2) the defendant's "knowledge of the contract"; (3) the defendant's "intent to cause a breach of that contract"; (4) that the defendant's actions "in fact caused a breach of the contract"; (5) that the plaintiff "suffered damages as a result of the breach"; and (6) that the defendant "enjoyed no privilege or justification for its conduct." *Seeger Enters. v. Town & Country Bank & Trust Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017). "At a minimum," the plaintiff "must show that a contract existed between it and a third party followed by a breach by the third party." *Griffin v. Jones*, 170 F. Supp. 3d 956, 968 (W.D. Ky. 2016) (quoting *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995)).

According to the record here, the only contract between PSC and Parr that YTA knew about during the relevant time period, *see Seeger Enters.*, 518 S.W.3d at 795, was a 2017 "Confidentiality Agreement" and a near-identical 2019 "Confidentiality Agreement." (D.N. 40-11, PageID.396–98; D.N. 41-20, PageID.847–51; *see* D.N. 43, PageID.952) Those agreements largely barred Parr from disclosing "any secret, confidential or proprietary information or know-how of [PSC] . . . without [PSC's] prior written consent." (D.N. 41-20, PageID.848) They also prohibited him from competing "directly or indirectly" with PSC for a certain number of years "following [Parr's] termination from the [c]ompany." (*Id.*) PSC asserts that "[d]espite . . . [YTA's] knowledge" of these two contracts, YTA "persisted in paying Parr commission-kickbacks and using Parr as YTA's go-between with VFM." (D.N. 43, PageID.952) But nowhere does PSC explain how such conduct, even if true, implicated Parr's confidentiality agreements with PSC, nor does it identify the specific provisions in those agreements that were allegedly breached. *See Griffin*, 170 F. Supp. 3d at 968 (noting that an underlying breach of contract is a "minimum" requirement for a tortious-interference claim). PSC suggests that the confidentiality agreements "prohibited" Parr from working for another company while employed

by PSC.  (D.N. 43, PageID.952; *see* D.N. 41, PageID.421)  But the non-compete provisions that PSC appears to reference expressly applied only to Parr's work "*following* [*his*] *termination* from [PSC]" (D.N. 41-20, PageID.848; *see* D.N. 40-11, PageID.396–97); they said nothing about what Parr could or could not do while still employed by PSC.

At bottom, PSC has failed to show that YTA's conduct "caused" an underlying "breach of [a] contract" between PSC and Parr.  *Seeger Enters.*, 518 S.W.3d at 795.  And that failure is fatal to its tortious-interference claim.  *See Griffin*, 170 F. Supp. 3d at 969 ("Without having identified a contract which was breached, [a party] cannot maintain a claim for tortious interference with contract."); *see also Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009) (concluding that a tortious-interference claim "fail[ed]" because the plaintiff had not satisfied the "critical element" of showing an underlying breach of contract).  The Court will therefore grant summary judgment on that claim in YTA's favor.

## E.     PSC's Aiding-and-Abetting Claim

Finally, YTA moves for summary judgment on PSC's claim that it aided and abetted Parr's breach of the fiduciary duties he owed to PSC.  (D.N. 40, PageID.253–56; *see* D.N. 31, PageID.201–02)  "To prevail on a claim of aiding and abetting a breach of fiduciary duty" in Kentucky, a plaintiff must prove "(1) the existence and breach of a fiduciary relationship; (2) the defendant gave the breaching party 'substantial assistance or encouragement' in effectuating the breach; and (3) the defendant knew that the party's conduct breached that fiduciary duty."  *Insight Ky. Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016). PSC claims that Parr "owed a duty of loyalty to PSC" throughout his employment with the company and that YTA, "over the course of years[,] encouraged and assisted Parr in acting for [his] personal (and YTA's separate) interests" despite knowing that such self-serving conduct

"conflict[ed]" with Parr's fiduciary duties.  (D.N. 41, PageID.422–23)  YTA contends that it is entitled to summary judgment on PSC's aiding-and-abetting claim because there is no evidence indicating that YTA knew that Parr was a fiduciary; that YTA "provided 'substantial assistance'" to Parr "in breaching any alleged duty of loyalty to PSC"; or that PSC suffered any damages "'directly attributable' to YTA's allegedly tortious conduct."  (D.N. 40, PageID.254–255)

To the extent that PSC's aiding-and-abetting claim is based on the 2014 GE-Rampf referral, PSC has produced evidence showing genuine disputes of material fact sufficient to defeat summary judgment.  *See Laster*, 746 F.3d at 726.  To prevail on its claim, PSC would first need to establish that Parr breached a fiduciary duty.  *See Insight Ky.*, 514 S.W.3d at 546.  PSC contends that "Parr owed a duty of loyalty to PSC," including at the time of the 2014 GE-Rampf referral (D.N. 41, PageID.422), which YTA does not dispute.[15]  *See ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 715 (6th Cir. 2005) ("There is no *per se* rule in Kentucky that a 'mere' salesperson cannot owe a fiduciary duty to his or her employer.").  And there is a genuine factual dispute as to whether Parr breached that duty by cutting his employer out of a $400,000 business opportunity in exchange for undisclosed commissions from another company.  *See Invesco Institutional (N.A.), Inc. v. Johnson*, 500 F. Supp. 2d 701, 709 (W.D. Ky.

---

[15] YTA asserts in its summary-judgment motion that PSC "has limited" its aiding-and-abetting claim "to dates after" Parr "was promoted to a 'high-level PSC sales manager' starting in 2015," a time period that would exclude the 2014 GE-Rampf referral.  (D.N. 40, PageID.254)  But PSC's allegations and arguments are not so limited.  PSC alleged in its amended complaint that the GE referral "constituted self-dealing and a breach of [Parr's] fiduciary obligations to PSC."  (D.N. 31, PageID.202)  And among the damages that PSC seeks as part of its aiding-and-abetting claim are the commissions that YTA earned as a result of the 2014 GE-Rampf referral (*see* D.N. 41, PageID.424), which would not be recoverable if they were not attributable to an underlying breach of Parr's fiduciary duties.  *See Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 201 (Ky. 2013).  PSC therefore argues, albeit indirectly, that Parr owed it fiduciary duties at the time of the 2014 GE-Rampf referral, and YTA does not contest the merits of that assertion in its summary-judgment motion.

2007) ("Where a fiduciary relationship exists, the fiduciary is obligated to remain 'loyal and faithful' to the principal's interest, and cannot 'lawfully serve or acquire any private interest of his own in opposition to it.'").  According to deposition testimony from Parr, he referred GE to YTA simply because he wanted to help his customer, and he did not expect any financial reward in return.  (*See* D.N. 40-9, PageID.376)  Parr also testified that the commission payments he subsequently received from YTA were "approved" by his manager at PSC.  (*Id.*, PageID.374)  But PSC has produced evidence indicating that Parr's referral of the GE job to another company was both surreptitious and detrimental to PSC's business interests (*see* D.N. 41-2, PageID.445–47).  *See Invesco*, 500 F. Supp. 2d at 709 (noting that fiduciaries cannot act "in opposition to" the principal's interests).   And PSC contends that it did not "discover[]" YTA's "commission kickbacks" to Parr until the summer of 2019 (D.N. 41, PageID.413; *see* D.N. 41-4, PageID.598; D.N. 41-18; D.N. 41-19), suggesting that Parr accepted commissions from another company for several years without disclosing them to his employer.  *See ClubSpecialists Int'l, LLC v. Keeneland Ass'n, Inc.*, No. 5:16-cv-345-KKC, 2018 WL 2050134, at *7 (E.D. Ky. May 2, 2018) (concluding that an employee's acceptance of payments from another company and, "more importantly," his failure to disclose them "breached his fiduciary duty to [his employer]").

If the 2014 GE-Rampf referral did breach Parr's duty of loyalty to PSC, then there is a genuine factual dispute as to whether YTA "substantial[ly] assist[ed] or encourage[d]" that breach, *Insight Ky.*, 514 S.W.3d at 546, by enticing Parr with promises of commissions.  *See ClubSpecialists Int'l*, 2018 WL 2050134, at *7 (concluding that secret payments made by one company to another company's employee "constituted 'substantial assistance or encouragement'").  That YTA paid Parr commissions is undisputed (*see* D.N. 41-18; D.N. 41-19), but whether those commissions were a post-referral reward or instead made pursuant to a pre-

referral agreement is not (*see* D.N. 40-4, PageID.308–09, 314). There is also a genuine factual dispute as to whether YTA "knew" that the 2014 GE-Rampf referral would breach Parr's fiduciary duties, *Insight Ky.*, 514 S.W.3d at 546: Yarbrough acknowledged in a January 2016 email to Parr, for example, that "GE was also a conflict for [Parr]" given his position with PSC at the time. (D.N. 41-10, PageID.787)

PSC cannot, however, base its aiding-and-abetting claim on any of the interactions between YTA and Parr that took place after the 2014 GE-Rampf referral. (*See* D.N. 41, PageID.423–24; D.N. 43, PageID.954–55) "Kentucky follows the Restatement (Second) of Torts, § 876 in defining the elements of" aiding and abetting a breach of fiduciary duty. *Insight Ky.*, 514 S.W.3d at 546. That section provides in turn that a party is "subject to liability" for any "*harm* resulting to a third person" because of that party's aiding and abetting. Restatement (Second) of Torts § 876 (Am. Law Inst. 1979) (emphasis added). But here, PSC has failed to show how YTA's post-referral discussions with Parr about a commission arrangement (*see* D.N. 41-10; D.N. 41-12) or its use of Parr to "reach a business arrangement with VFM" (D.N. 43, PageID.955) ended up harming PSC in any way. For example, PSC conceded in a deposition that, beyond the 2014 GE-Rampf referral, it was not aware of "any business . . . that was diverted from PSC to another company as a result of . . . Parr and YTA's efforts." (D.N. 41-2, PageID.453; *see id.*, PageID.252–54) Nor did PSC "uncover any business that was actually diverted from PSC as a result of th[e] proposed relationship" between YTA and VFM. (*Id.*, PageID.453–54) Thus, as to YTA's alleged arrangements with Parr following the 2014 GE-Rampf referral, there is no "harm resulting to [PSC]" for which YTA can be held liable. Restatement (Second) of Torts § 876.

Because genuine disputes of material fact preclude the Court from determining whether the 2014 GE-Rampf referral amounted to YTA aiding and abetting a breach of fiduciary duties,

YTA's summary-judgment motion on PSC's aiding-and-abetting claim will be denied.  *See* Fed. R. Civ. P. 56(a).  But at trial, that claim will be limited solely to the 2014 GE-Rampf referral because PSC has failed to show that it was harmed by any post-referral interactions between YTA and Parr.  *See* Restatement (Second) of Torts § 876.

## IV.

PSC separately moves for summary judgment on all of its claims against YTA and for summary judgment in its favor on YTA's counterclaim.  (*See* D.N. 41, PageID.402)  The Court must "evaluate" PSC's motion "on its own merits."  *McKay*, 823 F.3d at 866.  But given the extensive analysis above, the Court can dispose of PSC's motion in short order.

As to its breach-of-contract claim, PSC argues that summary judgment is warranted in its favor because the "undisputed record" establishes that YTA breached its obligation under the Agreement not to contract with PSC employees like Parr.  (D.N. 41, PageID.417; *see* D.N. 41-9, PageID.781)  But as explained in detail above, several genuine factual disputes remain as to whether the 2014 GE-Rampf referral was made pursuant to some sort of contract between YTA and Parr and whether they ever formed a "referral/commission agreement" as PSC alleges.  (D.N. 41, PageID.416)  For instance, Parr testified in a deposition that he was never entitled to a finder's fee for referring the GE job to YTA (D.N. 40-9, PageID.376), and Yarbrough testified that the proposed commission arrangements between Parr and YTA "never materialized" (D.N. 40-4, PageID.322).  Deciding whether these assertions should be believed is a task for a jury.  *Laster*, 746 F.3d at 726.

PSC is not entitled to summary judgment on YTA's breach-of-contract counterclaim for similar reasons.  PSC does not dispute that it failed to pay YTA tens of thousands of dollars in commissions that the latter otherwise earned under the Agreement.  (*See* D.N. 40, PageID.245;

D.N. 40-3, PageID.288–90)   PSC instead maintains that it was "relieved of its contractual obligation[]" to pay those commissions upon discovering YTA's "preexisting material breach" of the Agreement.   (D.N. 41, PageID.414, 419)   Yet as discussed above, whether YTA breached the Agreement at all, and whether any breaches were material such that PSC's non-performance was excused, are questions of fact that cannot be resolved on the current record.[16]

The Court concluded above that it will grant YTA's motion for summary judgment on PSC's tortious-interference claim, which necessarily means that PSC's summary-judgment motion will be denied as to that claim.   And summary judgment in PSC's favor on its aiding-and-abetting claim is likewise precluded by genuine disputes of material fact.   *See* Fed. R. Civ. P. 56(a).   For instance, as explained above, there is a genuine factual dispute as to whether Parr breached his duty of loyalty to PSC when he referred the GE job to YTA in exchange for commissions.   (*See, e.g.*, D.N. 40-9, PageID.374 (asserting that Parr's "agreement" with YTA to receive "finder's fees" was "approved" by Parr's then-manager at PSC))   There is also a genuine factual dispute as to whether YTA "knew" that the 2014 GE-Rampf referral breached Parr's fiduciary duties.   *Insight Ky.*, 514 S.W.3d at 546.   Yarbrough testified in a deposition, for example, that he thought the commissions YTA paid to Parr were "okay to do" (D.N. 40-4, PageID.311), yet in a January 2016 email, Yarbrough acknowledged that the GE referral was a "conflict for [Parr]" given his "situation" as a PSC salesperson at the time (D.N. 41-10, PageID.787).

---

[16] The Court's conclusion that genuine factual disputes preclude summary judgment in PSC's favor on YTA's breach-of-contract counterclaim necessarily means that PSC is not entitled to summary judgment on its declaration-of-rights claim.   (*See* D.N. 31, PageID.200 (alleging that PSC is "entitled to a declaration of rights" as to "whether YTA is entitled to any further commissions despite its material breaches of the Agreement"))

PSC has not shown that it is "entitled to judgment as a matter of law" on any of the claims at issue here.  Fed. R. Civ. P. 56(a).  Its motion for summary judgment will therefore be denied in its entirety.

**V.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)      YTA's motion for partial summary judgment (D.N. 40) is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to PSC's claim of tortious interference with contractual relations (Count III).  The motion is **DENIED** as to PSC's claims of breach of contract and aiding and abetting a breach of a fiduciary duty (Counts I and IV) and PSC's claim for a declaration of rights under the Agreement (Count II).   YTA's motion is also denied as to its counterclaim for breach of contract.

(2)      PSC's motion for summary judgment (D.N. 41) is **DENIED**.

(3)      The Court requests that Magistrate Judge Regina S. Edwards (*see* D.N. 6) conduct a status conference with the parties to set a final trial schedule and, at her discretion, a settlement conference.

August 22, 2022

**David J. Hale, Judge**
**United States District Court**